**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHN LASZLO and NICOLE LASZLO, <br><br>     Plaintiffs, <br><br>     v. <br><br> STATE FARM FIRE AND CASUALTY COMPANY, <br><br>     Defendant. | No. 23cv21529 (EP) (JRA) <br><br> **OPINION** |

**PADIN, District Judge.**

    Plaintiffs John Laszlo and Nicole Laszlo (the "Laszlos") bring this contract dispute against Defendant State Farm Fire and Casualty Company ("State Farm") seeking insurance coverage under their homeowner's insurance policy. D.E. 1 ("Notice of Removal") at 9. Before the Court is State Farm's omnibus motion (1) to limit Mr. Bledsoe's and exclude Mr. Gnatt's anticipated testimony under Federal Rule of Evidence 702; (2) to limit Mr. Bledsoe's anticipated testimony under Federal Rule of Civil Procedure 26(a)(2)(B) because of his nondisclosure; and (3) for summary judgment under Federal Rule of Civil Procedure 56(a). D.E. 21 ("Motion" or "Mot."). The Laszlos oppose. D.E. 29 ("Opp'n"). State Farm replies. D.E. 30 ("Reply").

    The Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). For the reasons explained below, the Court will **DENY in part** and **GRANT in part** State Farm's Motion. Specifically, the Court will permit Mr. Gnatt to testify and will deny summary judgment. At this time, the Court will also limit Mr. Bledsoe's testimony to repair costs.

I.    **BACKGROUND**[1]

A.    **Factual Background**

The Laszlos own a home in Kendall Park, New Jersey.  SOMF ¶ 1.  State Farm insured the Laszlos' home pursuant to a Homeowner's Policy, No. XX-XX-X614-6.  D.E. 21-8, Ex. A (the "Policy").  The Policy promised that State Farm would pay for certain losses to the Laszlos' home unless the loss was excluded or limited pursuant to Section I, "LOSSES NOT INSURED," of the Policy.  Policy at 14.  Section I provides in relevant part:

> 1. *We* will not pay for any loss to the property described in Coverage A that consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through m. below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
>
> . . .
>
> f. seepage or leakage of water, steam or sewage that occurs or develops over a period of time:
>
> (1) and is:
>
> (a) continuous;
> (b) repeating;
> (c) gradual;
> (d) intermittent;
> (e) slow; or
> (f) trickling; and
>
> (2) from a:
>
> . . .
>
> (c)  plumbing system, including from within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors.
>
> g. wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown;

---

[1] The facts are drawn from State Farm's Statement of Material Facts, D.E. 21-2 ("SOMF"), from the Laszlos' Counterstatement of Material Facts, D.E. 22-1 ("Counterstatement"), and from the exhibits referenced therein.  The facts described are undisputed unless noted otherwise.

. . .

i. wet or dry rot;

3. We will not pay for, under any part of this policy, any loss consisting of one or more of the items below.  Further, we will not pay for any loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

. . .

b. defect, weakness, inadequacy, fault, or unsoundness in:

. . .

(2)   design, specifications, workmanship, repair, construction, renovation, remodeling, grading, or compaction;
(3)   materials used in repair, construction, renovation, remodeling, grading, or compaction; or
(4)   maintenance;

of any property (including land, structures, or improvements of any kind) whether on or off the residence premises . . . .

Policy at 14-18.

Before January 28, 2023, Mr. Laszlo had noticed water on the bathroom floor on at least two occasions.  Counterstatement ¶ 3.[2]  On January 28, 2023, Mr. Laszlo noticed that about a bucket's worth of water had pooled on the bathroom floor.  *Id.* ¶ 2.  Although Mr. Laszlo cleaned up the water that day, he noticed that additional water accumulated on the bathroom floor later that day.  *Id.*

Mr. Laszlo hired a plumber, Brian Gnatt.  *Id.* ¶ 4.  Mr. Gnatt determined that the source of the water came from behind the bathroom vanity's wall.  *Id.*  ¶ 5.  Upon opening up the wall, Mr. Gnatt found a cracked pipe exhibiting a "golf ball-sized hole" that leaked water whenever the

---

[2] State Farm states that Mr. Laszlo observed water twice.  SOMF ¶ 3.  The Laszlos dispute this fact by stating that Mr. Laszlo previously noticed only small amounts of water before but did once notice a large amount of water a few days prior to January 28, 2023.  Counterstatement ¶ 3.  These facts are therefore in dispute and are for the fact finder to determine.

Laszlo's kitchen sink, anything in the bathroom, or the clothes washer ran.  D.E. 22-4, Ex. H ("Bledsoe Dep.") at 34:19-36:14; *see* D.E. 21-7, Ex. I; Counterstatement ¶ 6.  Mr. Gnatt then removed and replaced the broken pipe.  Counterstatement ¶ 8.

But behind the bathroom vanity's wall, Mr. Gnatt and the Laszlos also reported seeing tree roots, widespread water damage, and what appeared to be mold.  Counterstatement ¶ 7.  Mr. Gnatt also "[n]oticed a bad odor … and noticed mold."  D.E. 21-9 at 7.  The Laszlos then hired RestorePro, a restoration and mitigation company, to remedy the damage they had uncovered behind the bathroom vanity wall.  Counterstatement ¶ 9.  RestorePro worked for days.  *Id.* ¶ 12.  They removed flooring from the bathroom and the kitchen, they applied anti-microbial agents to the damage, and they ran a de-humidifier continuously for four days.  *Id.*  RestorePro discovered rot and decay in the wood frames of the Laszlos' home, mold, discoloration of the sheetrock and flooring materials, warping of the bathroom vanity, and vegetation.  *Id.* ¶ 10.  Some of the damage observed was caused by a leak.  *Id.*

On February 1, 2023, the Laszlos filed a claim with State Farm for the damage to their home.  *Id.* ¶ 13.  State Farm's notes reflect that Mr. Laszlo described the pipe leak as a "slow leak, water was pooling around the shower . . . [for] about a month, nothing crazy."  D.E. 21-9 at 8.  On February 22, 2023, State Farm sent a claim specialist, Terry Fugate, to inspect the damage at the Laszlos' home.  Counterstatement ¶ 16.  Mr. Fugate concluded that because the water damage was the result of "normal wear and tear" and "continuous repeated seepage and leakage from the drain line," it was not covered under the Policy.  D.E. 21-10, Ex. C.

State Farm then denied the Laszlos' claim for coverage but invited them to present any additional information that State farm should consider.  *Id.* at 5.  The Laszlos then engaged Mr. Bledsoe, a public adjuster, who emailed State Farm in March.  D.E. 21-10, Ex. D.  Mr. Bledsoe

disagreed with State Farm's claim denial and argued that the large "golf ball-sized" hole in the pipe indicated that the loss was abrupt and that the extensive water damaged discovered behind the bathroom vanity wall must have been caused by a previous leak.  D.E. 21-10, Ex. E.  Mr. Bledsoe advanced a theory that State Farm had yet to consider:  The Laszlos' clothes washer, which had been exhibiting "error codes," exhibited those "error codes" because of a clogged drain. D.E. 21-10, Ex. F.  Mr. Bledsoe explained that the clogged drain may have caused the pipe to burst.  *Id.*

State Farm considered Mr. Bledsoe's theory but maintained its denial of the Laszlos' claim for coverage.  D.E. 21-10, Ex. G.  The Laszlos brought suit in the Superior Court of New Jersey on June 12, 2023.  Notice of Removal at 2.

**B.    Procedural Background**

The Laszlos filed their Complaint in the Superior Court of New Jersey on June 12, 2023. Notice of Removal at 2.  The Laszlos' complaint alleges a single count: breach of an insurance contract.  *Id.* at 8-10.  State Farm answered on July 24, 2023, and demanded that the Laszlos disclose how much they sought in damages.  *Id.* at 2.  After the Laszlos specified that they seek $86,605.28 under the Policy, State Farm removed the case to this Court based on diversity jurisdiction.[3]  *Id.* at 2-4.  Following discovery, State Farm now moves to exclude Mr. Gnatt's expert testimony and to limit Mr. Bledsoe's testimony and also moves for summary judgment on the Laszlos' claim.  Mot.  The Laszlos oppose.  Opp'n.  State Farm replies.  Reply.

---

[3] Diversity jurisdiction is satisfied here.  The Laszlos are citizens of New Jersey.  Notice of Removal at 4.  State Farm is incorporated in and has its principal place of business in Illinois.  *Id.* Because there is diversity of citizenship between the Laszlos and State Farm, and because the amount in controversy exceeds $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 and State Farm properly removed the case to this Court pursuant to 28 U.S.C. § 1441.

## II.    EXPERT TESTIMONY

### A.    Legal Standard

The Federal Rules of Evidence—particularly Rule 702—limit the admissibility of "purportedly scientific evidence" and task judges with the responsibility of ensuring that proffered expert testimony is both reliable and relevant. *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 579-80 (1993); *see Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).

Under Federal Rule of Evidence 702, a witness cannot provide expert testimony unless:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In essence, Rule 702 explains that "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244. These three factors are often referred to as "qualification," "reliability," and "fit." *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."). The proponent of expert testimony must satisfy each prong by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

A witness qualifies as an expert under Rule 702 if the witness has "specialized expertise" in the subject matter at issue. *Scheider*, 320 F.3d at 404. The witness must "possess skill or knowledge greater than the average layman," *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.

2000), but need not be the "best qualified," *Pineda*, 520 F.3d at 244. "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril*, 128 F.3d at 806.

The witness's opinions must also "reliably flow from the facts known to the expert and the methodology used." *Oddi*, 234 F.3d at 146. Reliability is a flexible and case-dependent inquiry, *id.*, and courts should not use it to "exclud[e] all questionably reliable evidence," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). The Third Circuit has outlined several non-exclusive factors that courts may consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock*, 233 F.3d at 745-46 (quoting *Paoli*, 35 F.3d at 742) ("*Paoli* factors").

The third requirement, "fit," considers whether the expert testimony is relevant and whether the expert testimony will assist the fact finder. *Schneider*, 320 F.3d at 404. The standard for fit is "not that high" but is "higher than bare relevance." *Paoli*, 35 F.3d at 745. Fit "requires that expert opinions . . . apply principles or methods to the facts of the case and produce conclusions that have a debatable connection to the question in issue." *United States v. Ford*, 481 F.3d 215, 220 n.6 (3d Cir. 2007).

### B.    Analysis

State Farm challenges the admission of Mr. Bledsoe's testimony on the grounds that he lacks the required expertise under Rule 702. Mot. at 29. State Farm also challenges the admission

of Mr. Gnatt's expert report by arguing that it does not satisfy the standard for reliability or for fit. Mot. at 23-28. The Court disagrees and addresses each argument below.

### 1.    Mr. Bledsoe

State Farm argues that Mr. Bledsoe should be precluded from opining on the cause of the break in the PVC pipe because he is not qualified under Rule 702 to provide expert testimony.[4] Mot. at 30. The Federal Rules of Evidence's "liberal policy of permitting expert testimony . . . [requires that] at a minimum, a proffered expert witness on causation must possess skill or knowledge greater than the average layman in determining causation." *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir. 1987). Courts, however, should "esche[w] overly rigorous requirements of expertise and [be] satisfied with more generalized qualifications." *Paoli*, 35 F.3d at 741 (citing *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982)).

Mr. Bledsoe possesses "skill or knowledge greater than the average layman" that permits him to testify regarding the topics identified by the Laszlos. *Id.* "It is common knowledge that the role of an insurance adjuster is to inspect and assess property damage, determine the cause of such damage, and determine the available coverage for such damage under the relevant insurance policies." *Zeqa*, 2024 WL 4117426, at *9. Mr. Bledsoe has reviewed over a hundred claims during his time as a public adjuster. Bledsoe Dep. at 17:20-18:1. He has experience (albeit limited) in plumbing, and he has experience as a claims adjuster for State Farm. *Id.* at 15:15-20, 19:25-20:14,

---

[4] State Farm cites *Zeqa v. Hanover Ins. Co.*, No. 21-10066, 2024 WL 4117426, at *9-11 (D.N.J. Sept. 9, 2024) in its Reply brief for the proposition that a public adjuster's expert testimony may still be excluded for failure to satisfy the "reliability" and "fit" standards under Rule 702. Reply at 14. To the extent that State Farm challenges Mr. Bledsoe's testimony for failing to meet these standards, the Court will not consider State Farm's argument because it is confined to an explanatory parenthetical at the very end of its Reply in a section about Mr. Bledsoe's qualifications. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 n.17 (3d Cir. 2006) ("It is well-settled . . . that . . . failure to identify or argue an issue in [an] opening brief constitutes waiver of that issue . . . .").

33:7-14.  He also has experience determining the cause of water damage.  *Id.* at 21:20-22:2, 24:15-25.  In this case, Mr. Bledsoe determined that, based on his experience, "it was pretty obvious what the loss was."  *Id.* at 27:25-28:13.

State Farm's reliance on *Balu v. Cincinnati Ins. Co.*, No. 19-3604, 2021 WL 1427651 (E.D. Pa. Apr. 15, 2021)—which excluded a public adjuster's expert opinion—is misplaced.  *Balu* is not binding authority and is distinguishable.  There, the public adjuster seeking to provide expert testimony did not have experience with determining causation.  *Id.* at *3.  As this Court has previously explained in *Zeqa*, *Balu* does not cast doubt on the qualification of a public adjuster expert who does.  2024 WL 4117426, at *9.  And as explained above, Mr. Bledsoe has experience in plumbing and in determining the cause of water damage.  Mr. Bledsoe is therefore qualified to provide expert testimony regarding causation.  *See, e.g.*, *Equinox Props. LLC v. Harford Mut. Ins. Co.*, 2023 WL 5447279, at *3 (D.N.J. Aug. 24, 2023) (permitting public adjuster's expert testimony on causation because he possessed experience relevant to determining the cause of water damage).

### 2.    Mr. Gnatt

#### a.    Reliability

State Farm argues that Mr. Gnatt's conclusions are not supported by facts, by data, or by any reliable methodology because Mr. Gnatt did not test the pipe, reference textbooks or academic sources, or discuss the issue with peers.  Mot. at 19, 20-24.  State Farm imposes too high a standard for reliability.

The reliability inquiry is a flexible one.  *Daubert*, 509 U.S. at 580.  The inapplicability of some of the *Paoli* factors does not render an expert's opinion necessarily inadmissible.  *See, e.g.*, *Truong v. Delta Int'l Mach. Corp.*, No. 19-19384, 2021 WL 5441802, at *9 n.8 (D.N.J. Oct. 29,

2021) (collecting cases where expert opinion was admitted despite an absence of testing); *West Am. Ins. Co. v. Jersey Cent. Power and Light Co.*, No. 3-6161, 2008 WL 5244232, at * (D.N.J. Dec. 15, 2008) (admitting expert opinion despite lack of peer review and testability). In cases concerning property damage, an expert report "based entirely on [the expert's] physical inspection and his expertise and experience" may fully satisfy the reliability standard. *West Am.*, 2008 WL 5244232, at *8. Here, Mr. Gnatt's expert report is based on his physical inspection, a testable hypothesis, his expertise, and his experience.

Mr. Gnatt personally inspected the Laszlos' home two days after water appeared on the bathroom floor. D.E. 21-7, Ex. I ("Gnatt Rep." or "Mr. Gnatt's Report"). Upon physical inspection, he immediately noticed that water emerged from underneath the bathroom vanity when he ran the bathroom sink. *Id.* To investigate further, Mr. Gnatt broke down the bathroom vanity wall and discovered a break in a PVC pipe that serviced the Laszlos' clothes washer, kitchen sink, and bathroom. *Id.* In his report, Mr. Gnatt concludes that because water emerged so quickly from underneath the bathroom vanity after running *just* the bathroom sink, water would have emerged "very quickly and obviously" after running the Laszlos' clothes washer, which discharged much more water. *Id.*

Mr. Gnatt then concludes that the PVC pipe must have broken suddenly. *Id.* While he admits that he cannot determine exactly what caused the sudden break, he concludes that "[i]t is possible that an issue with the clothes washer caused a heavy blockage in the 2" PVC that caused the piping to crack under such heavy discharge when the clothes washer drains." *Id.*

Mr. Gnatt's ultimate conclusion that the break must have occurred suddenly seems to rely on a straightforward inference: if the break in the PVC pipe had been the result of some leakage or seepage over a period of time (rather than suddenly), the Laszlos would have noticed large

amounts of water on their bathroom floor *before* January 28, 2023 given their everyday use of the bathroom and their regular use of the clothes washer, which discharges much larger amounts of water compared to a water source like the bathroom sink.[5]  Although this simple inferential step is not explicit in Mr. Gnatt's Report, it is not so great an analytical gap that Mr. Gnatt's opinion is "untethered to the relevant factual basis underlying this case."  *Smith*, 2023 WL 3561406, at *5.

Mr. Gnatt's conclusion therefore satisfies the reliability inquiry because it is based on his physical inspection and a testable hypothesis, and as he states, his expertise and experience.  Gnatt Rep.; *see West Am.*, 2008 WL 5244232, at *8.  By running the bathroom sink and observing the discharge from the broken pipe onto the bathroom floor, Mr. Gnatt tested the hypothesis that the broken pipe would have similarly discharged water from the other outlets it serviced.  His testing technique indicated for him how much water discharged from the broken PVC pipe and how quickly.  State Farm does not identify any degree of error—nor is error apparent to the Court— that renders Mr. Gnatt's opinion unreliable.

"[A]n expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility."  *Smith*, 2023 WL 3561406, at *4 (quoting *N.J. Dep't of Envtl. Prot. v. Amerada Hess Corp.*, No.

---

[5] State Farm argues that Mr. Laszlo stated that he had noticed water on the bathroom floor on at least one other occasion.  SOMF ¶ 3.  Mr. Laszlo, however, also states that his daughters sometimes left the bathroom floor wet after taking showers.  D.E. 21-3, Ex. B ("Mr. Laszlo Dep.") at 18:18-19:17.  Whether the purported observations of water on the bathroom floor could have been the result of a slow leak in the PVC pipe are questions for cross-examination, not a reason for exclusion of Mr. Gnatt's Report.  *See Smith v. State Farm and Casualty Co.*, No. 19-10319, 2023 WL 3561406, at *5 (D.N.J. May 19, 2023) ("Where 'some of the facts relied on by the expert are in dispute, it is the role of the jury to resolve such disputes, and then credit or discredit the expert testimony as they see fit,' so long as the expert's opinions are based upon a sufficient factual record." (quoting *Colon v. Ashford Bucks Cnty., LLC*, No. 11-1464, 2012 WL 12903092, at *1 (E.D. Pa. Nov. 8, 2012))).

15-6468, 2019 WL 4052431, at *6 (D.N.J. Aug. 28, 2019)).  Mr. Gnatt's methods should "be viewed through the lens of the simplicity of the subject matter and the commonsense conclusion that he reaches." *Truong*, 2021 WL 5441802, at *10.  The Court therefore finds that the Laszlos have shown by a preponderance of the evidence that Mr. Gnatt's Report is reliable.

### b.    Fit

State Farm argues that Mr. Gnatt's opinion cannot meet the fit standard either because his opinion is "pure conjecture."  Mot. at 25.  State Farm points out that because Mr. Gnatt cannot conclude, with any degree of certainty, whether the washing machine caused the PVC pipe to break, his opinion cannot be helpful to the trier of fact.  Mot. at 25-28 (quoting D.E. 22-3, Ex. C ("Gnatt Dep.") at 85:22-86:2).  Fit, however, depends upon "the proffered connection between the scientific research or test result to be presented and [the] particular disputed factual issues in the case."  *Oddi*, 234 F.3d at 145 (quoting *Paoli*, 35 F.3d at 743).  It is not a high standard.  *Id.*  State Farm's argument misunderstands what the ultimate factual issue is in this case.

State Farm's liability does not turn on whether or not the Laszlos' clothes washer was ultimately responsible for the break in the PVC pipe.  The issue here is (a) whether the break in the PVC pipe occurred suddenly or whether it was the result of leakage or seepage over a period of time and (b) what damage can be attributed to the break in the PVC pipe.[6]  Mr. Gnatt therefore need not provide a conclusion as to what exactly caused the sudden break in the PVC pipe.  As described above in Section II.B.2, Mr. Gnatt's conclusion is not based on a mere series of assumptions but is based instead on his personal inspection and investigation of the pipe and running water, as well as his expertise and experience.

---

[6] State Farm's argument that Mr. Gnatt conceded he did not know whether the leak happened "all at once" or "gradually over time" mischaracterizes his testimony.  Mot. at 26.  Mr. Gnatt stated in the same answer that in his opinion, "it was probably once."  Gnatt Dep. 90:12-15.

Mr. Gnatt's Report is therefore distinguishable from the cases State Farm cites. For example, in *151 East Leaming Ave. Condo Association v. QBE Specialty Insurance Co.*, plaintiffs' expert there concluded that Hurricane Sandy damaged a property's drywall and home interior but provided no details at all regarding how he arrived at his conclusion. No. 14-175, 2015 WL 3795648, at *3-4 (D.N.J. June 18, 2015). In contrast here, Mr. Gnatt explains how (1) the connection of the PVC pipe to other water outlets; (2) his observations regarding how quickly the water ran out onto the bathroom floor; and (3) his understanding that the bathroom and the other water outlets were frequently used led him to the conclusion that the break must have been sudden. Gnatt Rep.

State Farm also cites *Havlink v. Schindler Elevator Corp.* There, plaintiff's expert concluded that a motion sensor in an elevator's closing doors must not have been operational because if it had been, it would have worked, and plaintiff's hand would not have been caught between the closing doors. No. 12-4610, 2014 WL 4854428, at *8-9 (D.N.J. Sept. 30, 2014). Mr. Gnatt's Report is distinguishable from this case too. As explained above, Mr. Gnatt tested his hypothesis and implicitly ruled out the possibility that the Laszlos would have noticed water on the floor for the first time on January 28, 2023 if the PVC pipe had been leaking or seeping over a period of time before then. *See supra* Section II.B.2.

While the Court recognizes that Mr. Gnatt's Report is scant, it is nevertheless sufficiently moored in a factual basis. Moreover, the facts of this case are simple. Mr. Gnatt's Report need not be more complicated to be helpful. The Court finds that the Laszlos have shown by a preponderance of the evidence that Mr. Gnatt's Report meets the requirement for fit.

Accordingly, State Farm's *Daubert* Motion to exclude the testimony of Mr. Gnatt and to limit the testimony of Mr. Bledsoe under Federal Rule of Evidence 702 will be **DENIED**.

III.    **REQUIRED DISCLOSURES**

A.    **Legal Standard**

"Under Federal Rule of Civil Procedure 26(a)(2), a party is required to disclose an expert report containing 'a *complete* statement of all opinions the witness will express and the basis and reasons for them.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297 (3d Cir. 2012) (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)).

When a party fails to comply with the disclosure requirements under Rule 26(a), Federal Rule of Civil Procedure 37(c)(1) prohibits that party from relying upon "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Nondisclosure is substantially justified when reasonable people could disagree as to whether compliance with Rule 26(a) demanded disclosure. *Rojas v. Acuity Brands Lighting, Inc.*, No. 12-2220, 2014 WL 794364, at *1 (D.N.J. Feb. 27, 2014). Nondisclosure is harmless if the party entitled to disclosure suffers no prejudice. *Reed v. Binder*, 165 F.R.D. 424, 230 (D.N.J. 1996). It is, however,"[t]he party who has failed to disclose information [who] bears the burden to how that the non-disclosure was substantially justified or is harmless." *Forrestal Guarani S.A. v. Daros Int'l, Inc.*, 3-4821, 2012 WL 13187472, at *6 (D.N.J. Apr. 2, 2012) (quoting *Bouder v. Prudential Fin., Inc.*, No. 6-4359, 2010 WL 2026707, at *3 (D.N.J. May 21, 2010)).

Rule 37 is "mandatory . . . and is designed to provide a strong inducement for disclosure of Rule 26(a) material." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995).

B.    **Analysis**

State Farm seeks to exclude the portions of Mr. Bledsoe's testimony that go beyond repair costs on the grounds that the Laszlos failed to comply with both Rule 26(a)(2)(B)(i) and with this

Court's Pre-Trial Scheduling Order, both of which require disclosure of an expert's opinions in a expert report.[7]  Mot. at 29.  State Farm is correct that the Laszlos have failed to comply with the requirements of Rule 26(a)(2)(B) and this Court's Pre-Trial Scheduling Order.  For the reasons explained below, the Laszlos should have produced an expert report detailing Mr. Bledsoe's anticipated testimony beyond repair costs.

The Laszlos argue that Mr. Bledsoe is not subject to the disclosure requirements of Rule 26(a)(2)(B) because he was not *initially* retained to provide expert testimony in this case and therefore, he need only provide a summary of his opinions pursuant to Rule 26(a)(2)(C).  Opp'n at 12-13.  That the Laszlos engaged Mr. Bledsoe in March, a few months before beginning litigation, will not defeat the disclosure requirements of Rule 26(a)(2)(B).  Indeed, the Laszlos appear to have engaged Mr. Bledsoe precisely to use his expertise and specialized knowledge to dispute State Farm's denial of their insurance claim.  *Armstead v. Allstate Property * Casualty Ins. Co.*, No. 14-586, 2016 WL 928722, at *3-4 (N.D. Ga. Mar. 11, 2016) (rejecting argument that a public adjuster's expert testimony is subject to Rule 26(a)(2)(C), rather than 26(a)(2)(B), because plaintiffs there employed him "for his technical expertise and specialized knowledge to advocate on Plaintiff's behalf in this insurance dispute").  Therefore, Mr. Bledsoe does not fall within the category of experts covered by Rule 26(a)(2)(C), which covers non-retained experts such as treating physicians who testify based on their "examination, diagnosis and treatment of a patient." *Longo v. Hanger Prosthetics & Orthotics, Inc.*, No. 12-2445, 2015 WL 915479, at *3 (M.D. Pa. Mar. 3, 2015).

---

[7] Mr. Bledsoe provided a repair cost estimate.  D.E. 21-7, Ex. G.  State Farm does not challenge Mr. Bledsoe's ability to provide expert testimony regarding the repair costs.  *See* Mot.

Here, Mr. Bledsoe's engagement post-dates Mr. Gnatt's repair work and RestorePro's repair work.  Unlike Mr. Gnatt, who personally inspected and repair the PVC pipe, Mr. Bledsoe has no personal knowledge of the break in the PVC pipe.  He has not directly observed anything and instead has relied on his expertise to form an opinion.  Therefore, he does not fall within the ambit of Rule 26(a)(2)(C).  Even if he did, treating physicians that testify beyond the scope of their observations during treatment must also provide expert reports.  *See Allen v. Parkland School Dist.*, 230 F. App'x 189, 192 (3d Cir. 2007) (affirming exclusion of treating physicians' testimony for going beyond the scope of treatment).  Because Mr. Bledsoe is slated to provide expert testimony at trial based on facts he did not personally experience or witness, and which therefore necessarily go beyond the scope of his observations, he must provide an expert report.

Moreover, Mr. Bledsoe, is subject not only to Rule 26(a)(2)(B), but he is subject to this Court's Pre-Trial Scheduling Order.  D.E. 6.  The disclosure requirements of Rules 26(a)(2)(B) and (a)(2)(C) are also subject to this Court's Orders.  Fed. R. Civ. P. 26(a)(2) (subordinating disclosure requirements of subsections (B) and (C) to what is "otherwise stipulated or ordered by the court").  This Court's Pre-Trial Scheduling Order specifies that "[n]o expert shall testify at trial as to any opinions or base those opinions on facts  not substantially disclosed in his report."  D.E. 6 ¶ 19.  The Laszlos identified Mr. Bledsoe as an expert witness.  D.E. 22-4, Ex. G ¶ 35.  Rule 37(c)(1) therefore prohibits the Laszlos from relying upon Mr. Bledsoe's expert testimony beyond repair costs unless the nondisclosure was substantially justified or harmless.  The Laszlos, however, do not demonstrate, let alone argue, that nondisclosure here was substantially justified or harmless.

The Laszlos instead argue that State Farm had notice of the content of Mr. Bledsoe's testimony because the Laszlos disclosed it in their responses to State Farms's interrogatories. D.E. 22-4, Ex. G ¶ 34. The Laszlos disclosed that Mr. Bledsoe would

testify to the adjustment of this claim, the conduct of the carrier, the damages sustained to the property, the causes of those damage[s], the policy coverages afforded, the necessary and property repairs, including the proper method of repair, any other facts or knowledge known by the adjuster relating to this loss or their expertise . . . .

*Id.* State Farm therefore had notice regarding the topics on which Mr. Bledsoe may opine and with that notice, deposed Mr. Bledsoe. Nevertheless, State Farm cannot consult any expert report detailing Mr. Bledsoe's conclusions. If Mr. Bledsoe were to testify at trial beyond repair costs, State Farm would be prejudiced because in preparing its defense, it would "have to guess how and why [Mr. Bledsoe] reached his . . . conclusion." *Reed*, 165 F.R.D. at 430.

Because discovery has closed and because the Laszlos have failed to show, or even argue, that nondisclosure should be excused, the Court at this time, will **GRANT** State Farm's Motion to exclude Mr. Bledsoe's testimony beyond repair costs. "To rule otherwise would circumvent the prior Orders of this Court and Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure." *Parkland School Dist.*, 230 F. App'x at 192 (quoting and affirming district court's order excluding expert testimony). Accordingly, at this time, Mr. Bledsoe may not testify beyond repair costs.[8]

---

[8] The Third Circuit cautions against the exclusion of expert testimony and considers it an "'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *See In re Paoli*, 35 F.3d at 791-92 (quoting *Myers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977)). The Laszlos, however, do not explain why their nondisclosure was harmless or substantially justified. Fed. R. Civ. P. 37(c)(1). Nor does either party identify (1) any prejudice or surprise that State Farm would have suffered if Mr. Bledsoe did testify or produce an untimely expert report; (2) the ability for the Laszlos to cure the prejudice; (3) the extent to which waiver of the applicable rules here would disrupt an orderly and efficient trial; nor (4) the Laszlos' bad faith or unwillingness to comply with this Court's Orders. *See Pennypack*, 559 F.2d at 904-05. If the Laszlos obtain leave to file a report that expands beyond the repair costs estimate in D.E. 22-4, Ex. G, this Court will reconsider its decision to limit Mr. Bledsoe's testimony to repair costs.

## IV.    SUMMARY JUDGMENT

### A.    Legal Standard

Courts should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *DeHart v. Horn*, 390 F.3d 262, 267 (3d Cir. 2004).

The movant bears the initial burden of showing the basis for its motion and demonstrating that no dispute of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant must support its position by citing to the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). Once the movant identifies evidence in support of its motion for summary judgment, the nonmovant must then counter with evidence that demonstrates there is a genuine issue of fact. *Big Apple BMW, Inc. v BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992). The Court must then view the evidence in the light most favorable to the non-moving party and determine whether a genuine dispute exists. *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).

### B.    Analysis

The Laszlos bear the burden to demonstrate that they have suffered a loss within the meaning of the Policy, but State Farm bears the burden to show that the loss falls within the scope

of an exclusion under the Policy.  *See Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 N.J. 29, 41 (1998) ("[T]he burden is on the insurer to bring the case within the exclusion." (quoting *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 95 (1997))); *see also Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (same).

The Laszlos have suffered some property damage.  Counterstatement ¶ 6 (agreeing that "Mr. Gnatt discovered a PVC drain pipe that was 'cracked and leaking heavily when either kitchen sink, lavatory, or clothes washer is discharg[ing]'").  The issue that remains is whether the property damage is covered or excluded under the Policy.  As explained further below, the Court finds that the Policy is not ambiguous and that there is a genuine issue of material fact regarding whether the broken PVC pipe caused the property damage that the Laszlos seek coverage for, and thereby falls within the Policy's coverage or within an exclusion.

       *1.    The Policy*

New Jersey law requires that insurance policies "be construed liberally in [the insured's] favor to the end that coverage is afford 'to the extent that any fair interpretation will allow.'" *Longobardi v. Chubbs Ins. Co. of New Jersey*, 121 N.J. 530, 582 (N.J. 1990).  When an insurance policy is clear and unambiguous, however, courts must give effect to the policy's plain and ordinary meaning.  *Lloyds of London*, 458 F.3d at 236.  An insurance policy is ambiguous if it is fairly susceptible to two meanings: one that favors the insurer and one that favors the insured.  *President v. Jenkins*, 180 N.J. 550, 563 (2004) (citing *495 Corp. v. New Jersey Ins. Underwriting Ass'n*, 86 N.J. 159 (1981)).  If a term is ambiguous, courts should construe the term in favor the insured.  *Lloyds of London*, 458 F.3d at 236.  However, even where a term is unambiguous, a term may be construed in accordance with the insured's reasonable expectations in exceptional

circumstances.  *Id.* at 237.  A court's construction of an unambiguous insurance policy is a matter of law.  *Id.* at 236.

The Laszlos argue that the term "over a period of time" is ambiguous because everything must occur over a period of time, even single-act occurrences.  Opp'n at 17 ("How can a single, isolated event *not* occur over a period of time, if 'time' may be measured in seconds?").  The Court disagrees that the term is ambiguous and finds that it plainly excludes single-act occurrences.

Although "period of time" is not defined by the Policy, "[a] word or phrase is not automatically rendered ambiguous simply because the policy fails to define it."  *Priest v. Roncone*, 370 N.J. Super. 537, 544 (N.J. Super. Ct. App. Div. 2004).  Where a Policy fails to define a term, the words must instead be interpreted in accordance with their plain and ordinary meaning.  *Id.* (quoting *Daus v. Marble*, 270 N.J. Super 241, 251 (N.J. Super. Ct. App. Div. 1994)).

Here, a "period" means "the completion of a cycle, a series of events, or a single action."[9] It also means "a portion of time determined by some recurring phenomenon."[10]  "Time" means "the measured or measurable period during which an action, process, or condition exists or continues."[11]  In the context of the Policy which—in the same provision—references "continuous or repeated seepage or leakage," the term "period of time" must then reference an interval of time over which some events occur as part of a series.  Policy at 15.  Against that backdrop, "over a period of time" clearly excludes single, isolated events.  *See Brodzinski v. State Farm and Cas. Co.*, No. 16-6125, 2017 WL 3675399, at *5 (E.D. Pa. Aug. 25, 2017) (concluding that "period of time" also excludes "single isolated events that do not occur over a period of time").  To understand "over a period of time" in the Policy in any other way would force a contrived meaning onto the

---

[9] *See* MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/period.
[10] *Id.*
[11] *See* MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/time.

term that is inconsistent with common sense. For example, if "over a period of time" included any event that took place over some—however measurable—unit of time, all events would be encompassed and the Policy's reference to "continuous or repeated seepage or leakage" would be surplusage.

Accordingly, the term "over a period of time," as used in the Policy, is unambiguous and plainly excludes single isolated events. In other words, if the PVC pipe behind the vanity in the Laszlos' bathroom broke abruptly, the loss associated with that break and the initial overflow of water would not qualify as "seepage or leakage of water, steam or sewage that occurs or develops over a period of time . . . from a plumbing system."[12] Any seepage or leakage that continued or repeated beyond any isolated rupture in the PVC pipe would, however, qualify as having occurred over a period of time.

### 2.    *Property damage*

State Farm is not entitled to summary judgment because the Laszlos have raised a genuine issue of material fact disputing whether some of the property damage observed was the result of continuous and repeated seepage or leakage of water from a plumbing system over a period of time.[13] If so, the damage would be an excluded loss under the Policy. As explained above in Section II, the Laszlos have provided admissible expert testimony regarding whether the PVC pipe broke abruptly or not and may provide further admissible expert testimony regarding the cause of the property damage observed and remediated. A reasonable jury could therefore credit Mr.

---

[12] Even if the term "period of time" could fairly be read to mean any period of time so long as it could be measured in infinitesimally small units of time, the Policy nevertheless also requires that the seepage or leakage of water also be "(a) continuous; (b) repeating; (c) gradual; (d) intermittent; (e) slow; or (f) trickling." Therefore, the loss associated with remedying a single isolated break would still be excluded from this part of the Policy. Policy at 15.

[13] The Laszlos do not seek coverage for water damage due to any previous leak. Counterstatement ¶ 10.

Gnatt's and could credit Mr. Bledsoe's admissible testimony,[14] and find that the Laszlos are entitled to some amount of coverage under the Policy.

The cases that State Farm relies on here are also distinguishable.  For example, in *Brodzinski v. State Farm Fire and Casualty Co.*, plaintiffs sought coverage for water damage caused by a leak in an air conditioning unit.  No. 16-6125, 2017 WL 3675399 (E.D. Pa. Aug. 25, 2017).  The court there granted summary judgment on the plaintiff's *bad faith claim* but noted, in dicta, that because the competing experts there disputed whether the damage was due to a "one time occurrence," there seemed to be a factual dispute regarding coverage.  *Id.* at *6.  Here too, there is a factual dispute regarding whether the PVC pipe broke because of a one-time occurrence.  Consequently, there is also a factual dispute regarding coverage.

State Farm also relies on *Fifth v. State Farm Insurance Co.*, No. 11-7440, 2014 WL 1253542 (D.N.J. Mar. 25, 2014).  In *Fifth*, the plaintiffs sought coverage for damage caused by a small leak in a single water line.  *Id.* at *5.  The court there granted summary judgment against plaintiffs because there was no evidence that the damage "sprung over night or resulted from some sudden accident or catastrophic event."  *Id.*  There, the uncontradicted evidence indicated that the leak occurred slowly over at least one month.  *Id.*  Here, however, the Laszlos concede that some of the damage observed was due to a pre-existing leak but represent that they do not seek coverage for that damage.  Counterstatement ¶ 10.  The Laszlos here seek coverage only for the damage associated with what they argue was the result of a sudden break in the PVC pipe.  *See id.*

Therefore, because the Laszlos have presented admissible expert testimony to dispute whether the break occurred abruptly or not, State Farm's responsibility under the Policy is still up for debate.  "What is presented here is a classic battle of the experts over disputed facts, to be

---

[14] Mr. Bledsoe may testify at least with respect to repair costs.  *See supra* n.7.

settled by the finder of fact." *Dzielak v. Whirlpool Corp.*, No. 12-89, 2017 WL 1034197, at *26 (D.N.J. Mar. 17, 2017).  Accordingly, the Court will **DENY** State Farm's motion for summary judgment.

## V.     CONCLUSION

For the reasons stated above, the Court will **DENY in part** and **GRANT in part** State Farm's Motion.  Specifically, the Court will permit Mr. Gnatt to testify, will deny summary judgement, but at this time, will not permit Mr. Bledsoe to testify beyond repair costs.  An appropriate Order accompanies this Opinion.

Dated: September 10, 2025

Evelyn Padin, U.S.D.J.